## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**PETER MANTHOS**                                    **CIVIL ACTION**

**VERSUS**                                             **No. 07-1302**

**JEFFERSON PARISH**                              **SECTION I/3**


### <u>ORDER AND REASONS</u>

Before the Court is a motion for summary judgment, filed on behalf of defendant, Jefferson Parish, and opposed by plaintiff, Peter Manthos.  For the following reasons, the motion is **GRANTED IN PART** and **DENIED IN PART**.


### *BACKGROUND*

Plaintiff, Peter Manthos ("Manthos"), began working at the Jefferson Parish Library Department ("Parish" or "Library") as a Library Associate in June of 2002.  Prior to that time, he had been diagnosed with a cardiac condition (atrial fibrillation), which caused difficulty breathing, fatigue, lightheadedness, rapid heartbeat, dizziness, and occasional fainting.[1]  In September, 2003, Manthos was diagnosed with orthopedic conditions in his back and knees.[2]  He alleges that the Parish informally accommodated these conditions without requiring him to visit

---

[1] R. Doc. No. 91-2, ex. 1, Manthos aff. ¶¶3-4.  The Court notes that the affidavit submitted by Manthos has not been signed by the Notary Public (Alexandra Erna Mora) before whom Manthos allegedly swore to the statements contained therein.

[2] Manthos aff. ¶6.  Manthos's diagnosed conditions were cervical spondylosis, lumbar spondylosis, degenerative disc disease, and osteoarthritis of the knees.  <u>Id.</u>

the Parish's doctor.[3]

During March 2006, Manthos was out on leave for a brief time.  He states that he

returned to work on or about March 14, 2006, and was assigned to a reference desk position in

the nonfiction department.[4]  He alleges that, despite his ability to perform that job, he was sent

home by his supervisors halfway through the day.[5]  By letter dated March 15, Library

Department Director Lon Dickerson ("Dickerson") informed Manthos that his remaining leave

without pay would expire on March 31, 2006.  In the same letter, he directed Manthos to attend a

meeting on March 20 in which his future employment with the Parish would be discussed.[6]

On March 20, Manthos met with Dickerson and Beverly Williams ("Williams") of the

Parish's Human Resource Management Department.  He provided letters from his orthopedist,

Dr. Warren Bourgeois ("Bourgeois"), and his cardiologist, Dr. Juan Lastra ("Lastra").[7]

Bourgeois's letter, dated March 13, 2006, placed "permanent restrictions" on Manthos's ability

to discharge library materials on a repetitive basis, prepare and unpack shipment materials,

shelve library materials, load the book drop, reach high and low places, stand for periods longer

than two hours, and lift materials on a repetitive basis.  Bourgeois also placed restrictions on

Manthos's ability to bend, stoop, twist, and turn, and to push heavy carts or bins.[8]  Lastra's letter,

---

[3] Id. ¶6.  In its support brief, the Parish states that this accommodation was in the form of a transfer to the
Audio Visual Department of the East Bank Regional Library, a department in which Manthos's bending and
squatting could be minimized.  R. Doc. No. 81-5, mem. supp. 3.

[4] Manthos aff. ¶¶9-10.  The Parish alleges that, by March 15, Manthos had exhausted all approved Sick,
Annual, Family, and Medical Leave, and 78 of his 90 available days of leave without pay.  R. Doc. No. 81-6,
Dickerson aff. ¶¶3-4.

[5] Manthos aff. ¶10.

[6] Id. ¶12; R. Doc. No. 81-7, ex. B.

[7] R. Doc. Nos. 81-8, 81-9, exs. C, D.

[8] R. Doc. No. 81-9, ex. D.

dated March 14, 2006, placed temporary restrictions on Manthos's ability to bend, stoop, twist, turn, and move materials.  Further, Lastra recommended that Manthos perform a light duty desk job.[9]

During the March 20 meeting, Manthos discussed his orthopedic condition with Dickerson and Williams, and requested accommodations under the Americans with Disabilities Act ("ADA").[10]  Dickerson and Williams allegedly told Manthos he was ineligible for consideration under the ADA.  According to Manthos, they further informed him that no light duty desk jobs were available throughout Jefferson Parish, and that all available jobs required heavy lifting.[11]

By letter dated March 21, the Parish acknowledged Manthos's request for accommodation.  It sent him a form entitled "Employee Request For Accommodation To Perform Job Functions" ("Accommodation Form") to be completed and returned by April 4.[12]  Manthos alleges that on or about March 25, his attorney, Glenn McGovern ("McGovern") wrote to Dickerson, Williams, and Personnel Director Martin Schwegmann ("Schwegmann") requesting accommodation for his disability and for permission to return to work.[13]  Meanwhile, Manthos timely submitted the completed Accommodation Form dated April 3 to the Parish.[14]  In this form, Manthos detailed the normal effects of his cardiac and orthopedic conditions, as well as the limitations those conditions imposed on his job functions.  He further requested to be

---

[9] R. Doc. No. 81-8, ex. C.

[10] R. Doc. No. 81-11, ex. F, Manthos dep. 110:11-23.

[11] Manthos aff. ¶14.

[12] R. Doc. No. 81-12, ex. G.

[13] Manthos aff. ¶16; R. Doc. No. 108-4, ex. 4.

[14] Manthos aff. ¶17; R. Doc. No. 81-17, ex. L.

placed in a desk job, identifying four specific positions in the Library.  Finally, he requested use of a wheeled stool, use of a motorized cart, and fewer tasks of shorter duration.[15]

On April 4, Manthos wrote to Williams, asking for credit for the involuntary leave he had taken since March 13.  In this correspondence, he allegedly reiterated his preexisting April engagements for heart surgery and his children's graduations.[16]  The next day, Dickerson replied to Manthos by letter, stating that his April 4 letter to Williams should have been brought to his (Dickerson's) attention.  He further advised Manthos that the concerns raised in the April 4 letter could be appealed to the Parish's Personnel Board.[17]  On April 10, however, Personnel Director Schwegmann wrote to Manthos's attorney, McGovern, informing the attorney that no further action would be taken on the April 4 letter.[18]  On or about April 11, Manthos personally went to Dickerson's office to deliver doctors' letters and other documents and he asked to speak with Dickerson.  Dickerson was allegedly present at that time, but "waved [Manthos] off and refused to speak to him."[19]

Manthos underwent heart surgery on April 24 to address his cardiac condition.[20]  Two days later, in an April 26 letter, Dickerson directed Manthos to meet with Dr. David Reiss ("Reiss") on May 5 for an evaluation of his ability to perform essential job functions.  Failure to

---

[15] R. Doc. No. 81-17, ex. L.  The positions identified were "teen center, reference desk, special collections depart., interlibrary loan, or another position with the Parish." Id.

[16] Manthos aff. ¶18.

[17] Id. ¶19.

[18] Id. ¶20; R. Doc. No. 108-4, ex. 5.

[19] Manthos aff. ¶21.

[20] Id. ¶22.

4

attend this medical evaluation, Dickerson wrote, would constitute "insubordination and will result in disciplinary action up to and including termination."[21]  On or about April 28, Manthos called Williams to discuss the appointment with Reiss.  He was allegedly told at some point that the appointment was set for May 1, rather than May 5.[22]

To clarify the apparent inconsistency between the two appointment dates, Manthos called Williams again to ensure he would be able to attend the appointment with Reiss.[23]  He was told by Williams that any arrangement would have to be made exclusively with Dickerson.  Manthos then left several phone messages for Dickerson, who did not respond.  Manthos called secretary Kathy Bourg ("Bourg") who allegedly forwarded an email message to Dickerson.[24]  After Dickerson refused to respond, Manthos alleges that he filed a complaint with the Equal Employment Opportunity Commission ("EEOC") on or about April 28.[25]  In an April 29 letter, Manthos wrote Dickerson to protest the treatment he had received, and to notify Dickerson of his filing with the EEOC.  Dickerson did not respond to this letter.[26]

Manthos did not attend the May 5 appointment with Reiss.  By letter dated May 12,

----

[21] R. Doc. No. 81-13, ex. H.  Manthos acknowledged receipt of this letter in his deposition testimony.  *See* R. Doc. No. 81-19, ex. N, Manthos dep. 133:16-23.

[22] Manthos aff. ¶23.

[23] It is unclear from the record when this second alleged conversation with Williams took place.  Further, it is unclear when the conflicting appointments cited by Manthos (his daughter's graduation and a post-heart surgery appointment) were scheduled to occur.

[24] Manthos aff. ¶24.  Manthos attached a copy of Bourg's email to his opposition memorandum, which was addressed not to Dickerson, but to Beverly Williams.  The "CC:" field is addressed to "wis77@bellsouth.net", an unidentified email address.  *See* R. Doc. No. 91-2, ex. 2.

[25] Manthos aff. ¶25.  The EEOC complaint has not been filed into the record in conjunction with the instant motion.

[26] Id. ¶26.  This letter from Manthos to Dickerson has not been filed into the record in conjunction with the instant motion.

Dickerson directed Manthos to attend a "pre-disciplinary hearing" in Dickerson's office on May 26.  "It is imperative that you attend this meeting," Dickerson wrote.[27]

Manthos did not attend the May 26 pre-disciplinary hearing.[28]  Manthos alleges that he did not attend the hearing because he believed the EEOC was in contact with the Library about mediation and because he believed attending the meeting would be futile.[29]  In a letter dated June 6, Dickerson formally terminated Manthos's employment with the Parish, effective May 26.  The bases for Manthos's termination were his failures to attend the May 5 appointment with Reiss and the May 26 hearing with Dickerson.[30]

Following his termination, Manthos elected to participate in the COBRA health insurance benefits plan, administered through COBRA Professionals, Inc. ("CPI").  CPI sent a correspondence to Manthos dated June 13, informing him that he could extend his benefits effective May 27.  CPI instructed Manthos to complete and return the enclosed enrollment form by August 11, which he did.[31]  In a June 22 letter, CPI acknowledged receipt of Manthos's enrollment form and informed him that it required receipt of payment no later than August 4 for the enrollment to be effective.[32]

Manthos submitted a payment, acknowledged by CPI on June 28.  That payment brought

---

[27] R. Doc. No. 81-14, ex. I.  Manthos acknowledged receipt of this May 12 letter in his deposition testimony.  R. Doc. No. 81-20, ex. O, Manthos dep. 139:7-140:8.

[28] The Parish states in its memorandum that Manthos filed an EEOC complaint on May 23.  R. Doc. No. 81-5, mem. supp. 5.

[29] Manthos aff. ¶28.

[30] R. Doc. No. 81-15, ex. J.  Dickerson informed Manthos that he had a right to appeal the termination to the Personnel Board.  Manthos did not appeal the termination.

[31] Manthos aff. ¶33.

[32] Id. ¶34.

his account current through the end of June.  To complete enrollment, further payment was still required by August 4.[33]  The June 28 letter also allegedly stated that, notwithstanding the August 4 deadline, continuing monthly dues were scheduled to commence beginning September 1.[34]

On or about July 11, Manthos was assaulted.  He was struck in the head, and suffered drowsiness and confusion as symptoms.[35]  On or about August 8, he called CPI to arrange payment for what he allegedly believed was the premium due September 1.  CPI informed him that his benefits had expired the day before for nonpayment.[36]  CPI further informed him that the Parish, as his former employer, had discretion to accept a late payment.[37]

Manthos next contacted Aubrey Devillier ("Devillier"), Benefits Administrator for the Library.  Devillier allegedly informed Manthos that the Parish made occasional exceptions for late payment, but that Manthos would have to furnish a doctor's corroboration of the circumstances.[38]  Manthos obtained a letter from his physician dated August 14.  When he called Devillier, Devillier allegedly informed him that federal law and Parish policy prohibited the Parish from reinstating COBRA benefits once the payment deadline had passed.[39]

Manthos then sought legal advice.  His attorney wrote the Library on or about August 21,

---

[33] Id. ¶35.

[34] Id.

[35] Id. ¶37.

[36] The expiration was presumably due to the failure to tender payment by the August 4 deadline.  See R. Doc. No. 88, second am. compl. ¶32.

[37] Manthos aff. ¶38.

[38] Id. ¶39.

[39] Id. ¶40.  The second EEOC complaint has not been filed into the record in conjunction with the instant motion.

tendering payment on Manthos's behalf, while explaining the medical justification for the late

payment. In an August 24 letter, CPI allegedly refused Manthos's request, stating that Jefferson

Parish would not make an exception in his case.[40]  On October 20, Manthos allegedly filed an

EEOC complaint, alleging that his COBRA benefits were cancelled in retaliation for his earlier

filing with the EEOC.[41]


*LAW AND ANALYSIS*

**I.      Summary Judgment Standard**

Summary judgment is proper when, after reviewing "the pleadings, the discovery and

disclosure materials on file, and any affidavits," the court determines there is no genuine issue of

material fact.  Fed. R. Civ. P. 56(c).  The party seeking summary judgment always bears the

initial responsibility of informing the court of the basis for its motion and identifying those

portions of the record that it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 266, 274

(1986).  The party seeking summary judgment need not produce evidence negating the existence

of material fact, but need only point out the absence of evidence supporting the other party's

case.  *Celotex*, 477 U.S. at 323, 106 S. Ct. at 2553, 91 L. Ed. 2d at 274; *Fontenot v. Upjohn Co.*,

780 F.2d 1190, 1195 (5th Cir. 1986).

Once the party seeking summary judgment carries its burden pursuant to Rule 56(c), the

other party must come forward with specific facts showing that there is a genuine issue of

---

[40] Id. ¶¶41-42.

[41] R. Doc. No. 81-5, mem. supp. 6.

material fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106

S. Ct. 1348, 1356, 89 L. Ed. 2d 538, 552 (1986). The showing of a genuine issue is not satisfied

by creating "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,'

'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37

F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). Instead, a genuine issue of material fact

exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d

202, 211-12 (1986). The party responding to the motion for summary judgment may not rest

upon the pleadings, but must identify specific facts that establish a genuine issue. Id. The

nonmoving party's evidence, however, "is to be believed, and all justifiable inferences are to be

drawn in [the nonmoving party's] favor." Id. at 255, 106 S. Ct. at 2513, 91 L. Ed. 2d at 216; *see*

*Hunt v. Cromartie*, 526 U.S. 541, 552, 119 S. Ct. 1545, 1551-52, 143 L. Ed. 2d 731, 741 (1999).


## II.     ADA Claim: Failure to Make Reasonable Accommodation

The ADA broadly prohibits "discriminat[ion] against a qualified individual with a

disability because of the disability of such individual in regard to job application procedures, the

hiring, advancement, or discharge of employees, employee compensation, job training, and other

terms, conditions, and privileges of employment." 42 U.S.C.A. § 12112(a) (West 2005).

Prohibited discrimination includes "not making reasonable accommodations to the known

physical or mental limitations of an otherwise qualified individual with a disability." Id. § (5)(a).

To prevail on a reasonable accommodation claim, the plaintiff "must establish that 1) he has a

disability; 2) he is qualified for the position in which he seeks employment; and 3) he was

9

discriminated against because of his disability."  Jenkins v. Cleco Power, LLC, 487 F.3d 309, 315 (5th Cir. 2007).


   A.    *Disability*

   Under the ADA, a disability is "a physical or mental impairment that substantially limits one or more of the major life activities of such individual."  42 U.S.C.A. § 12102(2)(A).  "Major life activities refers to those activities that are of central importance to most people's everyday lives."  Jenkins, 487 F.3d at 315.  The Parish does not expressly deny that Manthos lacks a disability.  Given the cardiac and orthopedic conditions alleged by Manthos, the doctors' letters corroborating those conditions, and the disabling effects on Manthos's daily activities, Manthos has satisfied this element of his claim with respect to the motion for summary judgment.


   B.    *Qualified Individual*

   The ADA defines a qualified individual as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C.A. § 12111(8).  "Essential functions are the fundamental duties of the job at issue and do not include the job's 'marginal functions.'"  EEOC v. E.I. Du Pont De Nemours & Co., 480 F.3d 724, 730 (5th Cir. 2007) (quoting Kapche v. City of San Antonio, 176 F.3d 840, 843 (5th Cir. 1999)).  The Code of Federal Regulations states that the following nonexhaustive list of factors may aid in determining which functions are essential to a particular position:

(i) The employer's judgment as to which functions are essential;
(ii) Written job descriptions prepared before advertising or
interviewing applicants for the job;
(iii) The amount of time spent on the job performing the function;
(iv) The consequences of not requiring the incumbent to perform
the function;
(v) The terms of a collective bargaining agreement;
(vi) The work experience of past incumbents in the job; and/or
(vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3) (2008).

The Parish contends that Manthos is not a qualified individual because he cannot perform the essential functions of the job he holds or desires.[42]  It cites the opinions of Manthos's own physicians, Lastra and Bourgeois, to support its position.  The Parish's argument ignores the reasonable accommodation condition within the definition of a qualified individual.  The reason why Manthos could not perform certain functions of the Library Associate position was because he required a reasonable accommodation.  The Court, therefore, turns it inquiry to whether the Parish afforded Manthos a reasonable accommodation.

C.    *Reasonable Accommodation*

Generally, it is the responsibility of the individual with the disability to inform his employer that an accommodation is needed.  See Cutrera v. Bd. of Supervisors of La. State Univ., 429 F.3d 108, 112 (5th Cir. 2005).  Once the employee has made such a request, the appropriate reasonable accommodation "is best determined through a flexible, interactive process that involves both the employer and the qualified individual with a disability."  Id.

---

[42] Id. at 7.

(quoting 29 C.F.R. § 1630.9, App.).  "When an employer's unwillingness to engage in a good

faith interactive process leads to a failure to reasonably accommodate an employee, the employer

violates the ADA."  Jenkins, 487 F.3d at 316 (quoting Loulseged v. Akzo Nobel Inc., 178 F.3d

731, 735 n.4 (5th Cir. 1999)).

The Parish argues that it satisfied its reasonable accommodation obligations under the

ADA by providing Manthos with the Accommodation Form, setting up the May 5 appointment

with Reiss for an independent physical evaluation, and, when that evaluation did not occur,

scheduling the May 26 predisciplinary hearing with Dickerson.[43]  The Parish contends that it was

Manthos, rather than the Parish, who, by missing the appointment with Reiss and failing to

attend the hearing with Dickerson, refused to participate in the accommodation process.

Manthos, on the other hand, argues that the Parish failed to engage in a good faith

interactive process to make reasonable accommodations.  He states that Dickerson "waved [him]

off and refused to speak to [him]" when he tried to give Dickerson documents related to his

medical conditions.[44]  He next claims he "was given the run around by Dickerson and Williams"

when he sought to reschedule the appointment with Reiss.[45]  He further argues that, based on the

Parish's conduct leading up to the May 26 hearing, his failure to attend is justified because doing

so would have been futile.[46]

---

[43] Id. at 8-9.

[44] Manthos aff. ¶21.

[45] R. Doc. No. 91, mem. opp'n 16.

[46] Id.  The parties dispute whether Manthos refused to attend the May 26 hearing because he could not bring his lawyer to the meeting.  The Parish cites convincing precedent for the proposition that "[n]othing in the ADA suggests that an employee has a right to be present with counsel at an internal meeting, even when the employee's future is considered."  Staub v. Boeing Co., 919 F. Supp. 366, 370 (W.D. Wash. 1996).  To the extent that Manthos justifies his failure to attend the hearing on the Parish's refusal to allow his attorney to accompany him,

There is no doubt that the reasonable accommodations process failed in this case.  The question is which party bears responsibility for that failure.  The Seventh Circuit has established a framework under which a court may identify and assign blame for a failed accommodation process:

> No hard and fast rule will suffice, because neither party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability. Rather, courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith.

Beck v. Univ. of Wis. Bd. of Regents, 75 F.3d 1130, 1135 (7th Cir. 1996).

Here, neither party is entirely innocent.  Other than holding the March 20 meeting and sending the Accommodation Form, the Parish's efforts to accommodate Manthos amounted to scheduling an independent verification of his documented physical ailments.  Beyond that May 5 appointment, its next step was to initiate disciplinary proceedings.  Meanwhile, Manthos missed both opportunities to get the accommodation process underway and beyond the preliminary stage.  Dickerson's letters, of which Manthos acknowledged receipt, made the consequences of missing those meetings very clear.

Drawing all justifiable inferences in Manthos's favor, see Anderson, 477 U.S. at 255, the Court concludes that there is a genuine issue of material fact as to whether the Parish engaged in a good faith effort to reasonably accommodate Manthos.  The Parish does not rebut nor present

---

such justification is rejected by the Court.

13

contrary evidence to Manthos's contention that Dickerson refused to see him on April 11. Meanwhile, though the record is far from clear, Manthos's allegations regarding his attempts to reschedule the appointment with Reiss demonstrate an unwillingness by the Parish to work cooperatively with him in a flexible process.[47]  Confronted with two scheduled dates for a single appointment with Reiss (May 1 and May 5), Manthos sought clarification for when the appointment would be held, but Dickerson and Williams allegedly refused to return his calls.  "A party that fails to communicate, by way of initiation or response, may . . . be acting in bad faith." Beck, 75 F.3d at 1135.  Notably, the Parish does not dispute Manthos's allegations regarding his attempts to contact Dickerson and Williams, choosing to focus instead on Manthos's failure to attend the May 26 hearing.[48]

To be sure, the Court is not impressed by Manthos's futility excuse regarding his failure to attend the hearing.  If, however, as Manthos alleges, Dickerson and Williams obstinately and repeatedly refused to entertain informal requests to discuss the situation, Manthos's failure to attend is excusable, if not admirable, conduct.  The essential task of a court assessing good faith in a reasonable accommodation process is to "attempt to isolate the cause of the breakdown and then assign responsibility."  Beck, 75 F.3d at 1135.  Here, there is a genuine issue of material

---

[47] The Court notes that Manthos's affidavit does not present the events from April 26 through May 5 in particularly clear fashion.  For instance, he claims that he initially believed the appointment was on May 1.  Judging from Kathy Bourg's email, Manthos had called Dickerson prior to 4:26 p.m. on April 28, seeking to change the appointment.  R. Doc. No. 91-2, ex. 2.  He then received Dickerson's April 28 letter scheduling the appointment for May 5.  Manthos aff. ¶23.  It is unclear if Manthos received this letter before the would-be May 1 appointment date had passed.  Also unclear is whether the graduation of Manthos's daughter, earlier claimed to be in April, see id. ¶18, conflicted with the May 1 appointment, May 5, or neither.  Though the Court rules in Manthos's favor on this motion, it expresses concern over the muddled and confusing presentation of the factual allegations in his affidavit.

[48] R. Doc. No. 104, reply at 6 ("All of the allegations regarding his 'attempts' to reschedule the Parish doctor's appointment do not address the fact that Mr. Manthos was given the opportunity to present his reasons for failing to attend the Parish physician's appointment at his pre-disciplinary hearing.").

14

fact with respect to whether the Parish failed to engage in a good faith interactive process, leading to the lack of reasonable accommodation and ultimate termination of Manthos. Summary judgment is, therefore, denied with respect to Manthos's ADA discrimination claim.

## III.    Retaliation

Manthos alleges retaliation claims under both the ADA and Title VII.[49]  Both the ADA and Title VII prohibit retaliation by employers against employees who have engaged in protected activity.  See 42 U.S.C.A. §§ 2000e-3(a); 12203(a).  In this circuit, the "court applies the same analysis to ADA and Title VII retaliation claims."  Grubic v. City of Waco, 262 F. App'x 665, 667 n.6 (5th Cir. 2008).  The Supreme Court's ruling in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), provides a burden-shifting analysis for the assessment of retaliation claims.

"To show an unlawful retaliation, a plaintiff must establish a prima facie case of (1) engagement in an activity protected by the ADA, (2) an adverse employment action, and (3) a causal connection between the protected act and the adverse action."  Seaman v. CSPH, Inc., 179 F.3d 297, 301 (5th Cir. 1999).  Once a prima facie case is established, "the burden shifts to the defendant to come forward with a legitimate, non-discriminatory reason for the adverse employment action."  Sherrod v. Am. Airlines, Inc., 132 F.3d 1112, 1122 (5th Cir. 1998).  "If the defendant advances a legitimate reason for the adverse employment action, then the plaintiff must adduce sufficient evidence that would permit a reasonable trier of fact to find that the proffered reason is a pretext for retaliation."  Id.

---

[49] R. Doc. No. 88, second am. compl. ¶¶2,7,13.  Though the complaint is far from clear on this point, the Court assumes that Manthos alleges retaliation under both statutes.

A.      *Retaliatory Discharge*

Manthos alleges that the Parish terminated his employment in retaliation for filing a complaint with the EEOC.[50]  The Parish, meanwhile, claims that it had a legitimate basis for firing Manthos: his insubordinate conduct in failing to attend the May 5 appointment with Reiss and the May 26 hearing with Dickerson.

1.      Prima Facie Case of Retaliation

Manthos has established, and the Parish effectively concedes, that he engaged in protected activity and suffered an adverse employment action.  First and foremost, Manthos requested a disability accommodation during his March 20 meeting with Dickerson and Williams.  See Tabatchnik v. Cont'l Airlines, 262 F. App'x 674, 2008 WL 248595, at *3 ("It is undisputed that making a request for a reasonable accommodation under the ADA may constitute engaging in a protected activity.").  Manthos further alleges that he filed an EEOC complaint on or about April 28.  He also wrote an April 29 letter to Dickerson protesting the treatment he had received from the Parish.  Moreover, on March 25, Manthos's attorney, McGovern, wrote a letter on his behalf to Williams, Dickerson, Schwegmann, and Jessica Travis, encouraging the Parish to comply with the ADA.[51]  Meanwhile, the termination of Manthos's employment on June 6 clearly constituted an "adverse employment action."[52]

---

[50] R. Doc. No. 29, am. compl. ¶6.  In his briefs opposing the Parish's motion, Manthos expands the basis for his retaliation claim to include his requests for accommodation.  However, the essential facts constituting the claim are set forth in Manthos's original and amended complaints.

[51] R. Doc. No. 108-4, ex. 4.

[52] In Burlington Northern & Sante Fe Railway Co. v. White, 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006), the Supreme Court stated that an adverse employment action in Title VII retaliation cases occurs when "a reasonable employee would have found the challenged action materially adverse."  Id. at 68.  This ruling changed

Having satisfied the first two elements of a prima facie case, Manthos must show a causal connection between the protected activity and the adverse action.  To satsify the causal link requirement, the protected activity need not be "the sole factor motivating the employer's challenged decision."  <u>Long v. Eastfield College</u>, 88 F.3d 300, 305 n.4 (5th Cir. 1996).  Because Manthos's request for an accommodation and subsequent filing of an EEOC complaint preceded his ultimate termination, he has demonstrated the existence of a causal connection between his protected activity and the adverse employment action. <u>See id.</u> at 306 (finding a causal link when the plaintiffs had filed complaints against their employers, the employers had knowledge of the complaints, and the plaintiffs were terminated after the complaints were filed).

### 2.      Legitimate, Non-Discriminatory Reason

Because Manthos presents a successful prima facie case of retaliation, the burden shifts to the Parish to provide a legitimate, non-discriminatory explanation for terminating Manthos. The Parish submits that Manthos was terminated for insubordination, specifically for his failure to attend the May 26 hearing with Dickerson.[53]  Dickerson's letters clearly spelled out the consequences to Manthos for failing to attend this hearing.  Further, Manthos was aware that he had missed — whether through his own fault or the Parish's — the earlier appointment with Reiss.  The Court concludes that Manthos's failure to attend this hearing is a legitimate basis for the Parish's termination of his employment.

---

the Fifth Circuit's controlling definition of "adverse employment action," which was previously limited to "ultimate employment decisions."

[53] R. Doc. No. 81-5, mem. supp. 11-14.  In its brief, the Parish, anticipating Manthos's argument that he attempted to reschedule the Reiss appointment, focuses on his failure to meet with Dickerson on May 26.  <u>Id.</u> at 12.

3.     Pretextual Justification

"The ultimate issue of retaliation requires the employee to prove that the adverse employment action would not have occurred 'but-for' the protected activity."  Sherrod, 132 F.3d at 1122.  In order to withstand the Parish's motion for summary judgment, Manthos "must reveal a conflict in substantial evidence."  Id.  "Evidence is substantial if it is of 'such quality and weight that reasonable and fair minded persons in the exercise of impartial judgment might reach different conclusions.'"  Id. (quoting Boeing Co. v. Shipman, 411 F.2d 365, 375 (5th Cir. 1969) (en banc)).

Manthos does not directly argue that the proffered rationale for his termination was a pretextual one.  Instead, he explains that he chose to skip the hearing because it would have been futile.[54]  Manthos cites no authority for the proposition that an employee's subjective belief in a meeting's futility casts doubt on the legitimacy of the employee's failure to attend as a basis for termination.  Moreover, it is unknown — beyond Manthos's unsubstantiated personal belief — whether attending this meeting would have indeed been futile.

Based on the prior dispute surrounding the Reiss appointment, it was reasonable for the Parish to expect Manthos to attend the hearing.  Dickerson's decision to condition Manthos's continued employment on attendance at the hearing was also reasonable, and was properly communicated to Manthos.  The Court concludes that Manthos has not met his burden of showing that his failure to attend the May 26 hearing was merely a pretext for his termination.  Summary judgment is granted to the Parish on this claim.

---

[54] R. Doc. No. 91, mem. opp'n 6 ("Perhaps the most important reason that Manthos did not attend the hearing was that it was a complete exercise in futility.").

18

B.      *Retaliatory Termination of COBRA Benefits*

In his second amended complaint, Manthos added a claim based on the Parish's alleged termination of COBRA benefits in retaliation for the filing of an EEOC complaint.[55]  The Parish contends that there is no causal connection between the filing of the EEOC complaint and the termination of COBRA benefits.[56]  Alternatively, the Parish contends that it had a legitimate reason for the cancellation of benefits, namely, Manthos's failure to pay the enrollment premium.

1.      Prima Facie Case of Retaliation

Having found above that Manthos engaged in protected activity by requesting accommodation and subsequently filing an EEOC complaint, the Court must determine whether he suffered an adverse employment action that was causally connected to the protected activity. The Parish does not dispute that termination of COBRA benefits, if wrongful, constitutes an adverse employment action, and the Court has no reason to find otherwise.  Termination of COBRA benefits falls into that category of actions that a reasonable employee would have considered materially adverse.  See Burlington Northern, 548 U.S. at 68.

Instead, the Parish contends that there is no causal connection between the protected activity and adverse action because the Parish "has no input and makes no determination relative to COBRA benefits administration including cancellation, denial, or approval of COBRA

---

[55] R. Doc. No. 88, second am. compl. ¶2.

[56] R. Doc. No. 81-5, mem. supp. 15.

insurance coverage."[57]  In some tension with this argument, the Parish further claims that it complied with an internal policy "enforced by Jefferson Parish" that governs cancellations of COBRA benefits.[58]  The testimony of Benefits Administrator Devillier suggests that the Parish does in fact have authority to make the termination decision pursuant to its own policies.[59]  The Parish cannot argue that, on one hand, it lacks authority to terminate benefits, and, on the other hand, it fully complied with its own policies in the termination of COBRA benefits.  The Court concludes that Manthos has satisfied the causal connection requirement and made out a prima facie case of retaliation.

### 2.      Legitimate, Non-Discriminatory Reason

To justify its apparent decision to terminate (or to advise CPI to terminate) Manthos's COBRA benefits, the Parish contends that Manthos failed to submit a timely premium payment. Cancellation for untimely premium payment, it argues, is in accordance with COBRA regulations as well as internal policy.  Manthos replies that 1) federal law permits the tolling of premium deadlines when an insured has been incapacitated; 2) the Parish, through the actions of Devillier, refused to consider medical documentation that it initially requested; and 3) the Parish's policy against accepting late payments is a fabrication.

First, it is undisputed that Manthos failed to complete his enrollment payments by August 4 as required.  He claims that this failure is a result of head injuries suffered from an assault on

---

[57] Id.

[58] Id. at 16.

[59] R. Doc. No. 81-21, ex. P, Devillier dep., 16:7-17-20.

or about July 11.  The Parish does not dispute the contention that Manthos was assaulted or that he suffered some degree of impairment from that assault.  Citing <u>Sirkin v. Phillips Colleges, Inc.</u>, 779 F. Supp. 751 (D.N.J. 1991), Manthos argues that the August 4 deadline should have been tolled due to his mental incapacity.

In <u>Sirkin</u>, the plaintiff's COBRA benefits were terminated by the defendant employer when the plaintiff failed to make timely payments.  Five days after the payment deadline, she was admitted to a local hospital, where she remained for several months.  A state court later determined that the plaintiff was mentally incompetent and appointed a legal guardian.  Independent psychiatric evaluations demonstrated that the plaintiff suffered from cerebral atrophy and memory impairment, and had been unable to tend to her own affairs for over four months.  When the guardian sought to bring the plaintiff's COBRA account current, the defendant employer refused to accept payment and reinstate the plan.

The court held that "where an insured misses a premium deadline under COBRA due to the insured's incapacity to know of or meet her obligation, the deadline for that premium payment is tolled for a reasonable period of time until the insured or her legally appointed guardian is able to cure the deficiency."  <u>Id.</u> at 757-58.

Though the degree of incapacity in <u>Sirkin</u> is far greater than that alleged by Manthos in this case, the Court finds <u>Sirkin</u> persuasive.  Manthos has created a genuine issue of material fact as to whether his alleged incapacity caused his failure to understand the payment deadline.  Therefore, the deadline was tolled until August 8 at the earliest, when Manthos understood the need to call CPI to tender payment.  Meanwhile, Devillier allegedly refused to accept payment on or about August 14 because it was past the August 4 deadline.  This was not a legitimate

21

reason for the termination of benefits: at that point, under <u>Sirkin</u>, Manthos was entitled to retain his COBRA benefits notwithstanding the technically untimely nature of his payment.

Accordingly, the Court concludes that, on the current record, Manthos has created a genuine issue of material fact with respect to the legitimacy of the Parish's explanation for terminating COBRA benefits.  At trial, Manthos will of course have to prove the degree of his incapacity and that the Parish was made aware of that incapacity when Manthos ultimately regained the ability to tender payment.  Summary judgment is denied with respect to this claim.

Because the Court has identified a genuine issue precluding summary judgment, the Court need not reach the Parish's other argument that its actions were justified by internal policy.  However, the Court briefly notes that the "COBRA PROCEDURES" policy filed into the record does not expressly preclude acceptance of the payment allegedly tendered by Manthos.  Paragraph 10 of that document states:

> It is Jefferson Parish's policy that if payment is not made by the last day of the month due or is not postmark (sic) by the last day of the month COBRA coverage is cancelled and can not be reinstated.[60]

Here, the payment in question was due on August 4.  The "last day of the month due" was, therefore, August 31.  Manthos called CPI to tender payment on August 8 and called Devillier on or about August 14.  Contrary to the Parish's contention, nothing in the internal policy precludes acceptance of the payment under the circumstances present in this case.

---

[60] R. Doc. No. 104-4, ex 3, at 2.

**IV.    Conclusion**

Accordingly, the motion for summary judgment is **GRANTED** with respect to Manthos's

claim for retaliatory discharge.  The motion is **DENIED** in all other respects.

New Orleans, Louisiana, August 20, 2008.

**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**